# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| CHRISTIAN GARCIA-ALVAREZ, on behalf of himself and those similarly situated, | § § § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:21-CV-00124 |
| | § | Judge Mazzant |
| FOGO DE CHAO CHURRASCARIA (PITTSBURGH) LLC, a foreign limited liability company, *et al*., | § § § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's Motion for Conditional Certification of an FLSA Collective Action (Dkt. #69).[1] Having considered the motion and the relevant pleadings, the Court finds that Plaintiff's motion should be **GRANTED in part**, **subject to the modifications identified in this Order.**

## BACKGROUND

This case arises from the employment relationship between Plaintiff Christian Garcia-Alvarez ("Garcia-Alvarez") and Defendants Fogo De Chao Churrascaria (collectively "FOGO"), the owners and operators of approximately forty "Fogo De Chao" steakhouse restaurants throughout the country (Dkt. #52). On September 8, 2020, Plaintiff filed this action against FOGO, asserting claims for failure to pay minimum wages under the Fair Labor Standards Act ("FLSA"),

---

[1] Though Plaintiff styled his motion as a "motion for conditional certification," under *Swales v. KLLM Transport Services., L.L.C.*, 985 F.3d 430 (5th Cir. 2021), plaintiffs and district courts should no longer refer to "certifications" of collective actions. *Lopez-Gonzales v. Ramos*, No. 2:20-CV-061-Z, 2021 WL 3192171, at *3 n.3 (N.D. Tex. July 28, 2021). Rather, "§ 216 plaintiffs should move the Court to sent notice to potential opt-in plaintiffs." *Id.*; *see also Fuller v. Jumpstar Enters., LLC*, No. H-20-1027, 2021 WL 5771935, at *1 n.1 (S.D. Tex. Dec. 6, 2021).

29 U.S.C. § 206 and the Pennsylvania Minimum Wage Act ("PMWA"), 43 Pa. Stat. Ann. § 333.104 (Dkt. #1).  On June 16, 2021, Plaintiff filed a First Amended Complaint ("FAC"), adding allegations that FOGO violated the Florida Constitution, Article X, Sec. 24.  (Dkt. #52 at pp. 5–6).

Plaintiff alleges that he worked as a churrasqueiro at several FOGO locations from 2015 to 2020, whereby he was denied minimum wage under the FLSA (Dkt. #69).[2]  Three additional plaintiffs ("Opt-ins") have also joined the lawsuit, though Plaintiff's motion for conditional certification only contains evidence from two of them, Jose Mendez-Ortiz ("Mendez-Ortiz") and Axel Torres-Nieves ("Torres-Nieves").  Presently, Plaintiff requests that this Court authorize notice to "[a]ll carvers (churrasqueiros) who worked for Defendants nationwide and were paid pursuant to the 'tip credit' (less than minimum wage plus tips) during the last three (3) years preceding this lawsuit" (Dkt. #69 at p. 2).  Alternatively, if the Court finds nationwide notice inappropriate, Plaintiff proposes that notice be sent to churrasqueiros who have worked at any of the locations Plaintiff and the Opt-ins worked or trained (Dkt. #69 at p. 2).  According to Plaintiff, these locations would include Atlanta, Georgia; Dunwoody, Georgia; Pittsburgh, Pennsylvania; Jacksonville, Florida; Irvine, California; and Detroit, Michigan (Dkt. #69 at p. 2).

According to Plaintiff, though each FOGO restaurant is structured as its own entity, all of the FOGO restaurants follow the same centralized policies (Dkt. #69 at p. 4).  For example, at each of the FOGO restaurants where permitted, churrasqueiros are paid the tipped minimum wage and FOGO takes a tip credit (Dkt. #69 at p. 7).  In the locations that use a tip credit, churrasqueiros also participate in a tip pooling arrangement, whereby a portion of the tips they receive go into a

---

[2] Notably, in 2021, FOGO began asking new and current employees to sign arbitration agreements, which require all FOGO employees to individually arbitrate any employment-related claims (Dkt. #76 at p. 25).  The Court discusses the implications of these agreements *infra* Section IV. C.

pool that is divided among all tip pool participants (Dkt. #69 at p. 7).  According to FOGO's policies, Servers, Bartenders, Bussers, Customer Service Representatives ("CSRs"), and Churrasqueiros participate in the tip pool (Dkt. #69 at p. 7).

Further, Plaintiff alleges that churrasqueiros have the same job duties at each of the FOGO restaurants—butchering, skewering, seasoning, cooking, and serving meat tableside to customers (Dkt. #69 at p. 6).  Plaintiff alleges that churrasqueiros' job duties also include significant pre-shift work (i.e., before customers arrive), which requires the churrasqueiros to arrive at work one to three hours before a shift begins to butcher meat, clean, and place charcoal (Dkt. #69 at p. 6). Importantly, according to Plaintiff, when performing this pre-shift work, churrasqueiros clock in using the churrasqueiro job code—meaning that when churrasqueiros perform this work they do so at the tipped rate but without making any tips  (Dkt. #69 at p. 6).

Accordingly, Plaintiff alleges that FOGO employs policies that deprive Plaintiff and the proposed collective of the minimum wage in two ways: (1) FOGO requires the churrasqueiros to participate in invalid tip pools that include non-tipped employees such as Customer Service Representatives ("CSRs") and employees who do not customarily and regularly receive tips; and (2) FOGO requires churrasqueiros to perform non-tipped work, more than twenty percent of the time, prior and during their shifts, but illegally pays them at the tipped minimum wage rate (Dkt. #69 at p. 8).

On December 8, 2021, Plaintiff filed the present motion (Dkt. #69).  Plaintiff (i) seeks authorization to send notice to the potential collective action members; (ii) requests discovery of the names, addresses, email addresses, telephone numbers, and social security numbers of the putative class to carry out notice; and (iii) requests the Court to authorize various details relating to the proper method and content of the notice.  On January 12, 2022, FOGO filed its response

(Dkt. #76).  On January 26, 2022, Plaintiff filed his reply (Dkt. #78).  To date, the parties have provided the Court with some discovery, including depositions of Plaintiff, Mendez-Ortiz, Torres-Nieves, and Richard Lenderman, FOGO's corporate representative.  Along with its response, FOGO also submitted declarations from several General Managers of FOGO's restaurants across the country (Dkt. #76).

## LEGAL STANDARD

### I.     FLSA

The FLSA requires employers to pay their employees the federal minimum wage, which is currently $7.25 an hour. 29 U.S.C. § 206(a).  Tipped employees must be paid a wage equal to the federal minimum wage, but the tips they receive can count toward that wage as long as employers pay them a minimum of $2.13 per hour. 29 U.S.C. § 203(m)(1–2); 29 C.F.R. § 531.50(a).  This employer discount is commonly referred to as a "tip credit." *Montano v. Montrose Rest. Assocs.*, 800 F.3d 186, 188 (5th Cir. 2015).  An employer is eligible for a "tip credit" only if certain requirements are met: (1) the employer informs its employees that it will take a tip credit, and (2) tipped employees are allowed to keep the tips they receive. § 203(m)(2); *Montano*, 800 F.3d at 188. The statute allows the pooling of tips among employees who customarily and regularly receive them, but the employer may not take a tip credit if tipped employees are required to share tips with employees who do not customarily and receive tips. § 203(m)(2); *Montano*, 800 F.3d at 188.  Further, the requirement that employees be allowed to retain their tips inversely means that employers are not permitted to keep employees' tips for any reason.  29 C.F.R. § 531.50(c).  This prohibition extends to employers' managers and supervisors, meaning managers and supervisors are prohibited from receiving tips distributed from a tip pool.

*Id.*

If an employee is engaged in a "dual occupation" (i.e., one job is tipped and the other is not), a tip credit cannot be taken for the time worked in the non-tipped occupation. § 531.56(e). However, if the tipped employee spends a portion of time performing work that is not tip-producing, but it directly supports tip-producing work, an employer can take a tip credit for that time as long as the work does not exceed more than twenty percent of the employee's work. *Id.*

## II.     Collective Actions

Section 216(b) of the FLSA authorizes employees to bring an action for an employer's failure to pay the minimum wage. 29 U.S.C. § 216.  Employees may bring an FLSA minimum wage action individually or as a collective action on behalf of themselves and other "similarly situated" employees. *Id.*  In contrast to a class action under Federal Rule of Civil Procedure 23, which generally requires potential plaintiffs to opt-out if they do not wish to be represented in the lawsuit, a collective action under § 216(b) requires potential plaintiffs to affirmatively opt-in to the lawsuit. *Swales*, 985 F.3d at 435.

Historically, courts in the Fifth Circuit have conditionally certified collective actions by adhering to a two-step approach outlined in *Lusardi v. Xerox, Corp.*, 118 F.R.D. 351 (D.N.J. 1987). However, in *Swales*, the Fifth Circuit rejected the traditional two-step *Lusardi* approach to collective action certification and created a more stringent process. 985 F.3d at 441. In contrast to the flexibility offered by *Lusardi*, *Swales* directs district courts to "identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.'" *Swales*, 985 F.3d at 441. After identifying the relevant material facts and legal considerations, the district court "should authorize preliminary discovery accordingly." *Id.*

In determining whether notice should be provided to those employees "similarly situated," the district court must ultimately decide whether "merits questions can be answered collectively." *Id.* at 442. This requires a court to consider "all of the available evidence to determine whether notice is going out to the putative class members," and the determination must be made as early as possible in the span of litigation. *Id*. at 441–42. Given this fact-intensive approach, the conclusion will vary case-by-case. *Id.* at 441.

Notice to potential plaintiffs is proper if the available evidence establishes that the plaintiff has met the "similarly situated" threshold. *See id.* at 443. The plaintiff may meet this threshold at varying stages of discovery; for instance, "notice might be justified when the pleadings and only preliminary discovery show sufficient similarity between the plaintiffs' employment situations." *Id*. at 441. Other times, if an employee seeks to certify a class where "plaintiffs have demonstrably different work experiences," a district court might "need more discovery to determine whether notice is going out to those 'similarly situated.'" *Id*. at 442. In the latter situation, a district court may: (1) "conclude that the [p]laintiffs and [o]pt-ins are too diverse a group" to support a collective action; (2) "decide that [the court] needs further discovery to make [a] determination"; or (3) "find that only certain subcategories of" employees "should receive notice." *Id*. at 443. In any case, to prevent the collective action from "quickly devolv[ing] into a cacophony of individual actions," *Swales* instructs the district court that potential plaintiffs are not similarly situated if answering a threshold merits questions requires a "highly individualized inquiry into each potential opt-in's circumstances." *Id.* at 442.

Under this newly articulated standard, "*Lusardi* and its requirements are dead and gone." *Collins v. Pel-State Bulk Plant, LLC*, No. MO20CV00083, 2021 WL 5234968, at *4 (W.D. Tex. Sept. 29, 2021). "The bottom line is that the district court has broad, litigation-management

discretion" when determining whether to "certify" a collective action. *Id.*

## ANALYSIS

Plaintiff seeks authorization to send nationwide notice to "[a]ll carvers (churrasqueiros) who worked for Defendants nationwide and were paid pursuant to the 'tip credit' (less than minimum wage plus tips) during the last three (3) years preceding this lawsuit" (Dkt. #69 at p. 2). In response, FOGO argues that "the definition of the putative plaintiffs is meaningless, conflates the theories of alleged liability, and includes those who would be, might not be, and could not be, part of the collective action" (Dkt. #76 at p. 6).  Additionally, FOGO contends that Plaintiff fails to establish his substantial similarity to those he seeks to represent (Dkt. #76 at p. 6).

For a court to issue notice to potential class members, a plaintiff bears the burden of showing that the plaintiff and the potential plaintiffs are similarly situated to proceed in the collective action. *Swales*, 985 F.3d at 435 n.65.  The plaintiff must demonstrate that the aggrieved employees are similarly situated with respect to their "employment situations." *Id.* at 441. Evidence of a similar job description coupled with allegations revolving around the same aspect of the job is sufficient to find putative class members similarly situated. *Id.*; *see Ramos*, 2021 WL 3192171, at *5 ("[C]ourts have required plaintiffs to provide evidence that potential opt-in plaintiffs had (1) similar job requirements and (2) similar pay provisions to support the allegation that potential opt-in plaintiffs are similarly situated.").  Further, the Fifth Circuit in *Swales* counseled that the district court must "consider all of the available evidence" and "rigorously scrutinize the realm of 'similarly situated' workers" by identifying, at the outset of the case, "what facts and legal considerations will be material" for this determination. *Swales*, 985 F.3d at 434, 441–42.

Plaintiff alleges FOGO enforces policies that deprive him and the potential collective action members of the minimum wage in two ways (Dkt. #69 at p. 8).  First, Plaintiff alleges that FOGO compels them to perform non-tipped work at the tipped minimum wage rate more than twenty percent of the time, thereby causing Plaintiff and the potential collective action members to be paid less than the minimum wage (Dkt. #69 at p. 2).  Second, Plaintiff alleges that FOGO requires Plaintiff and the potential collective action members to participate in a tip pool that includes non-tipped employees such as kitchen staff and CSRs (Dkt. #69 at p. 8).  Because these two theories of violations have different "facts and legal considerations [that] [are] material to determining whether a group of 'employees' is 'similarly situated,'" the Court considers these theories separately. *See Swales*, 985 F.3d at 441.  However, before turning to these issues, the Court turns to resolve two preliminary disputes between the parties: (1) the effect of *Swales* and its directive on the extent to which district courts should consider "merits" issues at the notice stage; and (2) whether Plaintiff must show that others are interested in participating in the action.

## I.    The Extent To Which The Merits of the Case Should Be Considered at This Stage

The parties disagree on the extent to which the Court should consider the "merits" of Plaintiff's claims when determining whether to grant notice.  For example, Plaintiff argues that FOGO's "argument[s] regarding the factual nature of Plaintiff's claims and Defendant's defenses thereto are irrelevant at this stage of the notification process" (Dkt. #69 at p. 18).  Conversely, FOGO contends that "[a]lthough Plaintiff urges this Court to ignore threshold 'merits' issues [], *Swales* invites this Court specifically to review those dispositive issues that bar an FLSA claim" (Dkt. #76 at p. 20).  In addition to these explicit arguments about whether the Court should consider the "merits" of Plaintiff's claims at this stage, the parties' briefing also contains more subtle arguments over the matter.  For example, some of FOGO's arguments focus on the lack of evidence

Plaintiff has presented on his claims at this point, which FOGO argues bars Plaintiff's claim (Dkt. #76 at p. 24).  The Court, thus, turns to *Swales* to determine how extensively it should examine these "merits" issues at this stage.

In *Swales*, several truck drivers brought an FLSA collective action, arguing that their employer had misclassified them as independent contractors, rather than as employees, and thereby wrongfully denied them overtime. 985 F.3d at 433.  Upon consideration of the plaintiffs' motion for conditional certification, the district court found that it could not consider evidence of whether the plaintiffs were misclassified as independent contractors because it went to the merits of the case. *Id.* at 441.  However, on review, the Fifth Circuit disagreed, stating that "[t]he fact that a threshold question is intertwined with a merits question does not itself justify deferring those questions until after notice is sent out." *Id*.  Indeed, the Court noted that "[j]ust as we held it was improper to ignore evidence of arbitration agreements in *JPMorgan*, it's improper to ignore evidence of other threshold matters like whether plaintiffs are 'employees' such that they can bring an FLSA claim." *Id*.  Thus, the Fifth Circuit held that "the district court needed to consider the evidence relating to this threshold question in order to determine whether the economic-realties test could be applied on a collective basis." *Id.* at 442.  And, according to the Fifth Circuit, "[i]f answering this question requires a highly individualized inquiry into each potential opt-ins' circumstances," the case should not proceed collectively. *Id*.

Though *Swales* directs district courts to consider the merits of an action at the outset, the focus of the inquiry is whether the merits question "can be answered collectively[.]" *Id*.  In other words, it is not whether a plaintiff "will ultimately prevail in proving all the elements of the alleged FLSA violation[,]" but whether the merits of the proposed collective's case can be decided collectively. *Sterling v. Greater Hous. Transp. Co*., No. CV H-20-910, 2021 WL 2954663, at *2

(S.D. Tex. July 14, 2021).  Further, other district courts in the Fifth Circuit agree that the similarly situated determination is not an opportunity for courts to assess the merits of the claim by deciding factual disputes or making credibility determinations. *See Torres v. Chambers Protective Servs*., No. 5:20-CV-212-H, 2021 WL 3419705, at *10 (N.D. Tex. Aug. 5, 2021) ("Nothing in *Swales* indicates or encourages courts to circumvent the notice analysis and move directly to the merits."); *Collins*, 2021 WL 5234968, at *4 ("But the notice stage is not the equivalent of the dispositive motions stage and thus is not the proper time to adjudicate the lawfulness of Defendants' policy"); *Powell v. One Source EHS, L.L.C*., No. CV 20-161, 2021 WL 4227064, at *4 (M.D. La. Sept. 16, 2021) ("At this stage, the focus is on whether the merits of the proposed collective's case can be decided collectively."); *Segovia v. Fuelco Energy Co*., No. SA-17-CV-1246, 2021 WL 2187956, at *7 (W.D. Tex. May 28, 2021) ("Moreover, when the concern about the proposed class is not that it exhibits some fatal dissimilarity, but, rather, a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification.") (internal quotations and citations omitted).

The Court turns to the next preliminary dispute between the parties—whether Plaintiff must show that others are interested in joining the lawsuit.

## II.    Number of Opt-In Plaintiffs Required

FOGO argues that "*Swales* does not extinguish the notion a plaintiff must show that others are interested in participating in this action" (Dkt. #76 at p. 25).  According to FOGO, though Plaintiff claims notice should be sent nationwide, he "has only submitted evidence from individuals who worked as churrasqueiros at FOGO Atlanta and FOGO Jacksonville" and "does not even suggest others are interested in joining this suit . . . ." (Dkt. #76 at p. 26).  On the other hand, Plaintiff argues he "has more than satisfied the applicable burden of persuasion that a

colorable basis exists for determining that others similarly situated to Plaintiff exist" (Dkt. #69 at p. 16).  Further, Plaintiff argues that at this stage, "typically [c]ourts do not require a high number of Opt-in Plaintiffs to have already joined the case" (Dkt. #69 at p. 15).

Here, though only three Plaintiffs have opted-in at this point and Plaintiff has submitted evidence from only two of them, the Court finds this will not preclude whether notice should be sent to other potential collective action members.  Indeed, "at this notice stage, the Fifth Circuit has not provided a categorical rule that plaintiffs must submit evidence that other individuals seek to opt-in to the case." *Aboin v. IZ Cash Inc.*, No. 4:20-CV-03188, 2021 WL 3616098, at *5 (S.D. Tex. June 29, 2021).  Moreover, other courts agree that a plaintiff need not identify other employees who have expressed a desire to opt-in at this stage. *See Francis-Luster v. Kelley Law Firm*, No. 3:19-CV-2708, 2022 WL 822468, at *2 (N.D. Tex. Feb. 10, 2022) ("Plaintiffs are not required to identify potential opt-in plaintiffs by name in order to proceed with their suit as a collective action."); *Collins*, 2021 WL 5234968, at *4 (finding defendant's argument that plaintiffs failed to show that other potential plaintiffs were interested in joining the lawsuit to be "misplaced"); *Dardar v. Pit Stop Eatery of Houma, LLC*, No. 20-1605, 2021 WL 5513417, at *5 (E.D. La. Mar. 30, 2021) (rejecting same argument).

In any event, other courts that have found that a plaintiff must show that others are interested in joining the lawsuit have found notice from two individuals to be sufficient. *See, e.g., Broome v. CRST Malone, Inc.*, No. 2:19-CV-01917, 2022 WL 205675, at *2 (S.D. Al. Jan. 21, 2022) (finding that plaintiff established that other plaintiffs desired to opt in because two potential plaintiffs had notified the court they wished to join the action); *Cf. Spillers v. Louisiana PHS, L.L.C.*, No. 3:21-CV-00762, 2022 WL 1675950, at *9 (W.D. La. May 10, 2022) (finding it

significant that plaintiff was unable to point to *one* other person interested in joining this litigation). Thus, the Court finds that only three individuals have opted-in is sufficient.

With these preliminary disputes resolved, the Court now turns to Plaintiff's allegations that he and the potential plaintiffs are similarly situated because FOGO requires them to perform non-tipped work at the tipped rate more than twenty percent of the time.

### III.    Performing Non-Tipped Work at the Tipped Rate

As noted, Plaintiff alleges that he and the potential collective action members are similarly situated because FOGO requires them to perform non-tipped work, more than 20 percent of the time, prior to and during their shifts, at the tipped minimum wage rate, thereby depriving them of the minimum wage (Dkt. #69 at p. 8).   More specifically, Plaintiff's motion focuses on the churrasqueiros' performance of *pre-shift*, non-tipped work at the tipped rate.   In support of his allegations, Plaintiff submitted his deposition testimony along with deposition testimony from Mendez-Ortiz and Torres-Nieves.   According to the Plaintiff's summary of the testimony, the pre-shift work includes butchering meat, cleaning meat, and placing charcoal and requires Plaintiff and the Opt-ins to arrive at work one to three hours before a shift to prepare for the shift (Dkt. #69 at p. 6).   Further, according to Plaintiff, all three individuals testified that when they performed this pre-shift work, they did so under the churrasqueiro job code—meaning they were performing this work at the tipped rate but without making any tips for the work (Dkt. #69 at p. 6).

In response, FOGO alleges that the restaurants handle the meat-related duties at the heart of Plaintiff's claims very differently (Dkt. #76 at p. 7).   To support these allegations, FOGO submits Declarations from several of the restaurants' General Managers attesting to the various pre-shift meat-handling procedures.   For example, FOGO explains that at some locations a non-tipped Butcher, who clocks in under a "Butcher" code and does not participate in the tip pool,

primarily handles the meat preparation duties (Dkt. #76 at p. 7).  Conversely, according to FOGO, other locations have never had a designated Butcher and instead other employees handle the meat preparation duties every day (Dkt. #76 at p. 8).  If a location has no designated Butcher or the designated Butcher is unavailable, then another employee or two, who clock in under untipped positions, arrive early to handle the meat preparation duties (Dkt. #76 at pp. 7–8).  Whether the employees clock in as a non-tipped Person in Charge ("PIC"), a non-tipped Butcher, or under the code "Meeting" (also untipped) depends on the restaurant, as well as when these employees arrive, and when they finish (Dkt. #76 at pp. 7–8).  When these individuals are done butchering and preparing the meat for the day, they clock out and clock back in as churrasqueiros (Dkt. #76 at pp. 7–8).  Additionally, FOGO asserts that Plaintiff's, Torres-Nieves', and Mendez-Ortiz' "testimony about job duties and restaurant operations diverges significantly" and is "at odds" with each other, which underscores that the meat cutting and preparation duties vary significantly by location (Dkt. #76 at p. 11).

Moreover, in support of its argument that the duties of the churrasqueiros vary significantly, FOGO submits Declarations from the Chief Operating Officer and General Managers of the FOGO restaurants that Plaintiff and the Opt-ins worked at regarding the operations of the restaurants.  Statements in these declarations conflict with portions of Plaintiff's, Torres-Nieves', and Mendez-Ortiz' deposition testimony.  For example, while Plaintiff, Torres-Nieves, and Mendez-Ortiz all testified they spent significant portions of their day preparing and butchering meats even though they were clocked in as churrasqueiros, the General Managers state that they ensure the churrasqueiros spend no more than twenty percent of their daily duties preparing meats (*See, e.g.,* Dkt. #77-1 ¶ 23; Dkt. #77-6 ¶ 17; Dkt. #77-7 ¶ 10).  Further, according to the General Managers, in the event a churrasqueiros is required to spend more than 20%

performing other duties, then that employee is not included in the tip pool (*See, e.g.,* Dkt. #77-1 ¶ 25; Dkt. #77-7 ¶ 12; Dkt. #77-8 ¶ 11).   Other disparities between the Plaintiff's and Opt-ins' testimony and the General Managers' Declarations include differences on the times the churrasqueiros arrive, how frequently churrasqueiros perform butchering duties during a shift, and whether churrasqueiros performing meat-cutting duties clock in using a PIC or butcher code.[3]

Here, applying the principles from *Swales*, the Court finds Plaintiff has failed to demonstrate that he and the potential collective action members—whether located nationwide or only from the restaurants Plaintiff and the Opt-ins worked at—are "similarly situated" for this claim.  As noted, "to determine whether the plaintiffs and potential collective-action members are 'similarly situated' in their 'employment settings,' courts typically examine whether they had 'similar job requirements' and 'similar pay provisions.'" *Fuller*, 2021 WL 5771935, at *4 (citing *Ramos*, 2021 WL 3192171, at *5).   Further, courts look to see whether Plaintiff has shown that there is "a 'factual nexus' that binds the class members' claims together such that hearing the claims in one proceeding is fair to all parties and does not result in an unmanageable trial of individualized inquiries." *Cotton-Thomas v. Volvo Grp. N. Am., LLC*, No. 3:21-cv-113, 2021 WL 2125003, at *2 (N.D. Miss. May 25, 2021).

Certainly, there are some common aspects between Plaintiff and the Opt-ins' employment situations for this claim. For example, the churrasqueiros had the same "principal duties"—

---

[3] Though Torres-Nieves and Mendez-Ortiz testified that they were required to clock in using the churrasqueiro job code at the Atlanta restaurant one and two hours before the restaurant opened, respectively, (Dkt. #69, Exhibit E at p. 4; Dkt. #69, Exhibit F at p. 10), Carlos Mezardi, the General Manager for the Atlanta FOGO, states that the churrasqueiros not involved in meat preparation arrive "shortly before" the restaurant opens at 11:30 am (Dkt. #77-7 ¶ 11).  As to the Jacksonville location, while Mendez-Ortiz testified that he sometimes arrived at 9:00 am or 10:00 am and clocked in using the churrasqueiro job code, (Dkt. #69, Exhibit F at p. 11), Marcio Welter, the General Manager of the Jacksonville FOGO, states that the churrasqueiros arrive shortly before 11:00 am (Dkt. #77-6 ¶ 12).  Further, though Torres-Nieves testified he might spend up to three hours of a four-hour shift in the back cutting meat while clocked in as a churrasqueiro, (Dkt. #69, Exhibit E at p. 7), Rick Lenderman's Declaration states that churrasqueiros performing butchering duties during the time they would be serving guests "happens infrequently" (Dkt. #77-1 ¶ 23).

14

butchering, skewering, seasoning, cooking, and serving meat tableside.   Further, the churrasqueiros were paid in the same way—the tipped minimum wage with FOGO taking a tip credit.   However, the similarly situated analysis focuses upon the features of which make the particular policy or practice unlawful. *Ramos*, 2021 WL 3192171, at *6.   And the record evidence that does exist—both Plaintiff's and FOGO's—shows that the churrasqueiros are *not* similarly situated in that they performed extensive non-tipped work at the tipped rate.

To be sure, in "consider[ing] all of the evidence," Plaintiff and FOGO have vastly different accounts of whether churrasqueiros are similarly situated in that they perform pre-shift, non-tipped work at the tipped rate. *See Swales*, 985 F.3d at 442.   The depositions from Plaintiff, Mendez-Ortiz, and Torres-Nieves, though inconsistent at times, indicate that churrasqueiros perform some non-tipped work at the tipped rate.   Comparatively, the Declarations from the General Managers and the Chief Operating Officer suggest that this is not the case—at least not to an extent that violates the law.   For example, though Plaintiff, Mendez-Ortiz, and Torres-Nieves all testified they performed extensive pre-shift work butchering meat while clocked in as churrasqueiros, Declarations from the General Managers of the restaurants state that these duties are performed by employees who clock in using various non-tipped codes, and the employees not performing these duties clock in right before the shift starts.   However, resolving this factual dispute for determining whether the proposed collective is similarly situated would be improper. *See infra* Section I. Instead, the focus of the inquiry is directed to whether the merits of the proposed collective's case can be decided collectively—not whether Plaintiff will ultimately prevail on his claim. And, here, the evidence from both sides at this stage shows that determining whether a potential plaintiff could recover for performing non-tipped work at the tipped rate would "require[] a highly

15

individualized inquiry" and "quickly devolve into a cacophony of individual actions." *Swales*, 985 F.3d at 442.

Indeed, the performance of non-tipped duties does not invalidate the tip credit exception unless it extends beyond twenty percent of an employee's work time. Thus, the Court would have to consider whether an employee was clocked in as a churrasqueiro or in another non-tipped capacity, what tasks each churrasqueiro performed, whether the duties were "related" or "unrelated" to his tipped duties, and whether the time spent exceeded the twenty percent threshold. Further, that the churrasqueiros differed on how early they arrived, how long it took them to cut meat, and how much overall time they spent cutting meat daily further indicates that the answers to these questions would vary significantly. Moreover, Plaintiff and the others all admitted that without speaking with each employee individually, there is no way to determine the job duties of a churrasqueiro at any given time.  Accordingly, determining whether FOGO is liable to each potential plaintiff for the performance of non-tipped work at the tipped rate "requires a highly individualized inquiry into each potential opt-in's circumstances . . . ." *Swales*, 985 F.3d at 442.

For example, as to the meat cutting and preparation duties—which form the crux of Plaintiff's claims—Plaintiff's and the Opt-ins' testimony reveals that they had significantly different experiences depending on the work location.  For example, Plaintiff and the Opt-ins' differed on whether they used a non-tipped code or were paid at the tipped rate when they performed this work.  While Plaintiff admitted sometimes that he clocked in as a PIC while performing pre-shift work, (Dkt. #69, Exhibit D at p. 8), Mendez-Ortiz testified that he never clocked in and out using a code other than the churrasqueiro code while performing butchering work (Dkt. #69, Exhibit F at p. 11).

16

Further, the individuals differed on what time they were required to arrive—even at the same FOGO location.  For example, while Torres-Nieves testified that he arrived at the Atlanta restaurant one hour before the restaurant opened, Mendez-Ortiz testified that he was required to be there two hours before the restaurant opened (Dkt. #69, Exhibit E at p. 4; Dkt. #69, Exhibit F at p. 10).  Moreover, the Opt-ins' testimony differed significantly regarding how much time they spent cutting meat during a shift.  Indeed, Mendez-Ortiz testified that he only spent minutes cutting meat during his shift (Dkt. #69, Exhibit F at p. 10), whereas Torres-Nieves testified that he might spend up to two or three hours of his four-hour shift in the kitchen cutting meat (Dkt. #69, Exhibit E at p. 7).  Importantly, these differences go to the heart of Plaintiff's and the Opt-ins' claims that they are similarly situated because FOGO requires them to perform extensive non-tipped work at the tipped rate.  These variables all affect whether a putative plaintiff maintains a viable claim with respect to the performance of non-tipped duties.

In sum, Plaintiff has failed to show that the potential plaintiffs are so similarly situated that the collective action will not "devolve into a cacophony of individual actions." *Id.*  Indeed, this case is like other cases where courts have refused to authorize notice because determining whether the collective action was similarly situated "would require the court to evaluate, on an individual basis, whether and to what extent the proposed class members' rights were violated." *Marquis v. Sadeghian*, No. 4:19-CV-626, 2021 WL 6621686, at *3 (E.D. Tex. Dec. 30, 2021), *report and recommendation adopted*, No. 4:19-CV-626, 2022 WL 200367 (E.D. Tex. Jan. 21, 2022); *see Fuller*, 2021 WL 5771935, at *5 (finding that plaintiff failed to show that he and other drivers were similarly situated though the drivers' workday structures were similar and all drivers were paid in the same way because there was no evidence that the plaintiffs' hours were common among drivers); *Cotton-Thomas*, 2021 WL 2125003, at *2 (finding that plaintiff failed to show she and

other employees were similarly situated when the employees had different supervisors, work settings, and differing frequencies of alleged violations and plaintiff failed to identify a policy that required her to work without a lunch break or how often employees worked through their lunch breaks); *Eltayeb v. Deli Mgmt., Inc*, No. 4:20-CV-00385, 2021 WL 5907781, at *4  (E.D. Tex. Dec. 14, 2021) (finding that plaintiff had not shown he was similarly situated with other delivery drivers though they shared similar job duties and were subject to the same pay practices because determining who could recover required an unworkable "highly individualized inquiry").

Indeed, in a similar attempted collective action involving FOGO, another district court noted that "[e]ven among the churrasqueiros, plaintiff-specific inquiries would be necessary to determine whether each churrasqueiro ever worked as a kitchen churrasqueiro during his employment at Fogo De Chao, and if so, during which shifts." *Balassiano v. Fogo De Chao Churrascaria (Orlando) LLC*, No. 6:19-CV-2140, 2020 WL 7365264, at 7 (M.D. Fla. Dec. 15, 2020), *report and recommendation adopted*, No. 6:19-CV-2140, 2021 WL 2019722 (M.D. Fla. Jan. 7, 2021). Thus, in *Balassiano*, the court recommended denying conditional certification because the individualized inquiries rendered conditional certification unwarranted. *Id.*  So too here.  Determining whether a potential plaintiff could recover for performing non-tipped work at the tipped rate would "require[] a highly individualized inquiry." *Swales*, 985 F.3d at 442.  For this reason, the Court finds that Plaintiff has not met his burden of showing that he and the potential collective action members are similarly situated.

The Court turns to Plaintiff's next claim that churrasqueiros are similarly situated nationwide based on FOGO's alleged invalid tip pooling arrangement due to the inclusion of the CSRs.

**IV.      Invalidity of the Tip Pool Due to Inclusion of the CSRs**

Next, Plaintiff argues that he and the putative class are "similarly situated" because they were all employed as churrasqueiros, and they are all owed compensation as a result of FOGO's use of an invalid tip pool (Dkt. #69 at p. 12).  According to Plaintiff, the tip pools at each of the FOGO restaurants improperly include CSRs—a non-tipped management position (Dkt. #69 at p. 12).[4]  Thus, Plaintiff alleges that the invalid tip pools resulted in Plaintiff and the potential collective action members giving up tips that belonged to them, causing them to receive less than minimum wage (Dkt. #69 at p. 12).

Plaintiff explains that CSRs have the same job duties at each FOGO restaurant—walking through the restaurant speaking to customers and ensuring they are having a positive experience; assisting in serving desserts and pouring wine; taking inventory of wine and verifying dining room standards are met; and resolving customer complaints (Dkt. #69 at pp. 7–8).  According to Plaintiff, the CSRs are not paid pursuant to the tip credit, but take part in the tip pool (Dkt. #69 at p. 8).  Plaintiff contends that the record at this point suggests the CSRs have "at least some management responsibilities" (Dkt. #78 at p. 3).  For example, CSRs attend manager meetings, as well as business and networking meetings as requested (Dkt. #69 at p. 8).  And CSRs validate service staff knowledge for an hourly employee training program (Dkt. #78 at p. 3).  Thus, Plaintiff claims that he has provided specific facts based on personal observation to support his and the Opt-ins' belief that there was a companywide policy of improperly including CSRs in the tip pool that can be resolved collectively (Dkt. #69 at p. 14).

---

[4] Plaintiff also alleges at times that FOGO improperly includes non-tipped kitchen staff in the tip pool (Dkt. #69 at p. 12).  However, Plaintiff offers no further argument or evidence on this allegation, and, therefore, the Court does not consider this claim.

In response, FOGO admits that the tip pool at FOGO is comprised of several non-management positions, including Servers, Churrasqueiro I, Churrasqueiro II, Bartenders, CSRs, and Bussers, all of which FOGO alleges are guest-facing positions that customarily and regularly receive tips (Dkt. #76 at p. 9).  According to FOGO, CSRs' primary role is providing customer service and explaining to guests the FOGO concept (Dkt. #76 at p. 8).  Further, CSRs "do not focus on churrasqueiro performance, are not members of management, and have no responsibility with respect to hiring, firing, and/or discipline" (Dkt. #76 at p. 8).  While CSRs "do not regularly attend management meetings," if they do, "their involvement is limited to customer service issues and upcoming events, not employee discipline" (Dkt. #76 at p. 9).  Further, FOGO argues "the evidence reveals CSRs regularly and customarily receive tips" (Dkt. #76 at p. 24).  Thus, according to FOGO, Plaintiff has presented "no evidence suggesting the CSR role is a non-tipped management position" (Dkt. #76 at p. 24).

Here, the parties' arguments over Plaintiff's tip-pooling claim mostly go toward the merits of Plaintiff's claim and whether it is ultimately appropriate to include CSRs in the tip pool.  For instance, FOGO argues that "[u]nder *Swales*, the Court may deny Plaintiff's request to send notice to those because doing so will 'stir up' unnecessary and meritless litigation in a circumstance where there is no claim as a threshold matter" (Dkt. #76 at p. 25).  However, as noted *infra* Section I, though *Swales* directs district courts to consider the merits of an action at the outset, the purpose is to determine whether the merits question "can be answered collectively." 985 F.3d at 442.  Indeed, "the notice stage is not the equivalent of the dispositive motions stage and thus is not the proper time to adjudicate the lawfulness of Defendants' policy." *Collins*, 2021 WL 5234968, at *4; *see also Swales*, 985 F.3d at 442 ("Considering, early in the case, whether merits questions can be answered collectively has nothing to do with endorsing the merits.").

20

**A. Whether Plaintiff's Tip Pooling Claim Can Be Resolved Collectively**

Here, though FOGO's arguments focus on attacking the merits of Plaintiff's claims, Plaintiff has put forth evidence showing that he and the potential collective action members are similarly situated in that they participate in FOGO's alleged invalid tip pooling plan that includes CSRs. Indeed, according to Plaintiff, churrasqueiros nationwide have the same job duties; they are all paid in the same manner (pursuant to the tip credit); they were all subject to the same pay policy at issue; and they are all owed compensation as a result of FOGO's use of an invalid tip pool. Moreover, the evidence shows that CSRs nationwide have the same job duties, have at least some management responsibilities, and participate in the tip pool.  Thus, Plaintiff has shown that the churrasqueiros to whom he wants to send notice to nationwide have similar job duties and are all subject to the same unlawful pay policy—an invalid tip pooling arrangement. *See Torres*, 2021 WL 3419705, at *6; *see also Collins*, 2021 WL 5234968, at *3 (finding plaintiffs met their burden of establishing substantial similarity where plaintiffs shared the same job titles, performed the same job duties, and were subject to the same policy).  Further, there is no evidence that FOGO's likely defense—that its tip pools are valid—requires an individualized inquiry. *See Torres*, 2021 WL 3419705, at *7 (noting that where defenses are individualized, this weighs against a similarly situated finding).

Moreover, Plaintiff has shown "a 'demonstrated similarity' among potential opt-in plaintiffs in a way where one proceeding is fair to all parties and does not result in unmanageable, individualized inquiries." *Ramos*, 2021 WL 3192171, at *4 (citing *Swales*, 985 F.3d at 443).  Here, because Plaintiff's claims involve a universal policy—FOGO's use of an allegedly invalid tip pool—the lawfulness of the policy can be resolved collectively and does not require a highly fact-specific individualized analysis. While there are some differences between some of the putative

collective action members, FOGO has not provided any evidence that these differences relate to the alleged unlawful policy or preclude collective resolution of this case. *See Francis-Luster*, 2022 WL 822468, at *3 ("When plaintiffs' claims are based on their employer's allegedly unlawful policy, the differences that are unrelated to the policy will not provide a basis for a court to find . . . against a similarly situated finding.") (internal quotations omitted); *see also Segovia*, 2021 WL 2187956, at *8 ("Even if there are numerous differences between individual plaintiffs, such differences will not preclude a collective action unless they are material to ultimate issues before the trial court.") (internal quotations omitted).

For example, FOGO points out that its restaurants have utilized different systems to distribute tip earnings—some have used a tenure-based system in distributing tip earrings, while others have used a system where employees receive a pro rata portion of the tip pool based on the number of hours worked (Dkt. #76 at p. 10). Further, FOGO argues that "the myriad ways individual locations' managed their staff, staffing procedures, and tip pools" precludes a finding of sufficient similarity (Dkt. #76 at p. 26). Yet FOGO fails to show how these differences affect whether the churrasqueiros are owed compensation because of FOGO's use of an invalid tip pool—the heart of Plaintiff's claim. *See Francis-Luster*, 2022 WL 822468, at *3 ("Even when potential members' work settings differ, however, [this] . . . will not weigh against a finding of sufficient similarity unless liability *turns on* those differences.") (emphasis in original).

In sum, Plaintiff has sufficiently shown, on the current record, that the Court can determine the central merits question on a collective basis. While FOGO disputes Plaintiff's allegations, it has not identified differences that require individualized proof or shown how these differences affect adjudication of the alleged common unlawful practice—improperly including CSRs in the tip pool. As such, the Court finds that Plaintiff and his proposed collective are similarly situated.

*See T.S. v. Burke Found.*, 521 F. Supp. 3d 691, 697–98 (W.D. Tex. 2021) (class certification was appropriate because the central merits question could be resolved on a class-wide basis); *see also Sterling*, 2021 WL 2954663, at *2-*3 (granting plaintiff's motion for conditional class certification because Plaintiff showed that the court could determine the relevant threshold issue on a class-wide, rather than, individualized basis).

### B. Nationwide Notice is Warranted

FOGO argues that no evidence supports nationwide notice (Dkt. #76 at p. 26).  Indeed, according to FOGO, "Plaintiff's conclusory assertion [] that all FOGO restaurants have tip pools does not overcome Lenderman's detailed testimony about the myriad ways individual locations managed their staff, staffing procedures, and tip pools" (Dkt. #76 at p. 26).  The Court disagrees. While FLSA violations at one of a company's multiple locations generally are not, without more, sufficient to support company-wide notice, if there is a reasonable basis to conclude that the same policy applies to multiple locations of a company, then nationwide certification is appropriate. *See Flowers v. MGTI, LLC*, No. H-11-1235, 2012 WL 1941755, at *4 (S.D. Tex. May 29, 2012) (collecting cases); *Cf. Ramos,* 2021 WL 3192171, at *6 ("The Court finds Plaintiffs are unable to meet the burden to show that se[r]vers at other locations are similarly situated because they lack evidence that each [] [r]restaurant operated within a universal policy.").

Here, with regard to Plaintiff's tip pooling claim, there is evidence that the FOGO restaurants that use a tip credit all share the same policy of including CSRs in the tip pool.  Indeed, Plaintiff has offered evidence from churrasqueiros that have worked at several FOGO locations and have been paid in a similar manner and subject to FOGO's alleged invalid tip pooling arrangement.  Further, the standard Tip Pooling Agreement that FOGO requires churrasqueiros to sign states that CSRs are included in the tip pool (Dkt. #77, Exhibit 1).  More importantly, however,

FOGO admits that at each of its restaurants that use a tip credit the CSRs participate in the tip pool and have the same job duties (Dkt. #69 at p. 7).  Thus, there is evidence that FOGO allegedly utilizes an invalid tip pooling arrangement nationwide.  While FOGO argues that the individual locations' management of their staff, staffing procedures, and tip pools precludes nationwide notice, the Court has already noted these differences are not material to determining whether Plaintiff and potential plaintiffs are similarly situated.  Rather, the lawfulness of FOGO's policy can be determined collectively.

### C. The Arbitration Agreement

FOGO states that it provided to all employees a Mutual Arbitration Agreement (the "Arbitration Agreement") the week of June 21, 2021 (Dkt. #76 at p. 15).  According to FOGO, each FOGO employee was informed that signing the Arbitration Agreement was voluntary, and regardless of a confirming signature, an employee's continued employment constituted acceptance of the Arbitration Agreement (Dkt. #76 at p. 15).  Further, according to FOGO, any employee hired after July 1, 2021 must review and execute the Arbitration Agreement (Dkt. #76 at p. 15).  Under the Arbitration Agreement, employees are required to individually arbitrate any employment-related claim such as the one here (Dkt. #76 at p. 25).  Plaintiff does not genuinely dispute the existence or validity of the Arbitration Agreement.

FOGO argues that those bound by the Arbitration Agreements are not "similarly situated" to those who are not subject to the agreements (Dkt. #76 at p. 15).  Plaintiff does not dispute this proposition.  Nor could he.  In *JPMorgan Chase and Co*, the Fifth Circuit held that it was beyond the district court's discretion to order notice to employees who had signed arbitration agreements and were thus not potential participants of the FLSA collective action. 916 F.3d 494, 502–03 (5th

Cir. 2019).   Accordingly, Fifth Circuit precedent is clear—when employees are bound by a valid arbitration agreement, notice should not be sent to them. *See id.*

Here, because some of FOGO's employees are subject to the Arbitration Agreement, these individuals should be excluded from receiving notice.  Along the same lines, Plaintiff is not entitled to the contact information of the employees bound by the Arbitration Agreement. *Ortiz v. Trinidad Drilling, LLC*, No., 2020 WL 7055903, at *4 (W.D. Tex. Dec. 2, 2020).  To be sure, in *JPMorgan,* the Fifth Circuit also stated explicitly that district courts do not even have discretion to order employers to provide the contact information of the employees who have signed arbitration agreements. *See* 916 F.3d at 504 n.23.

### D. Conclusion

In sum, the Court finds that Plaintiff has met his burden of establishing that he and the other churrasqueiros are similarly situated in that they are all subject to FOGO's invalid tip pooling arrangement.  However, based on the Court's ruling that Plaintiff and the potential collective action members are *not* similarly situated in that they perform non-tipped work at the tipped rate, the Court finds that Plaintiff's proposed definition of who should receive notice is too broad. *See Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 931–32 (5th Cir. 2005) (observing that district court had the "discretion to modify the original certification order to limit the scope of the class" in an FLSA collective action"); *see also Heeg v. Adams Harris, Inc.*, 907 F. Supp. 2d 856, 861 (S.D. Tex. 2012) ("A court also 'has the power to modify an FLSA collective action definition on its own' if the 'proposed class definition does not encompass only similarly situated employees.'") (citing *Baldridge*, 404 F.3d at 931-32)).  Accordingly, at this time, the Court finds that an appropriate definition of similarly situated workers in the context of this litigation is the following:

> All carvers (churrasqueiros) who worked for Defendant nationwide during the last three (3) years[5] preceding this lawsuit that were paid pursuant to the 'tip credit' (less than minimum wage plus tips), participated in a tip pool contribution plan that included Customer Service Representatives, and claim they are owed minimum wage.[6]

However, because the Court has revised the definition on its own, the Court believes the parties should have an opportunity to propose modifications they believe are appropriate. Therefore, the Court orders the parties to meet and confer and jointly prepare a proposed definition of the similarly situated workers in this litigation. If there are portions of the definition on which the parties do not agree, the parties should submit their respective positions to the Court for resolution. The proposed collective action definition should be filed with the Court within 10 days of this Order.

The Court now turns to analyze Plaintiff's proposed notice form.

## IV. Proposed Notice to Putative Class Members

The Supreme Court has recognized that a trial court has a "substantial interest in communications that are mailed for single actions involving multiple parties." *Hoffmann-La Roche*, 493 U.S. 165, 171 (1989). Accordingly, it is well within the purview of the Court to monitor the preparation and distribution of a notice sent to putative class members, and to "ensure that it is timely, accurate, and informative." *Id*. at 172. In exercising its discretionary authority over the notice-giving process, however, "courts must be scrupulous to respect judicial neutrality . . . and must take care to avoid even the appearance of judicial endorsement of the merits of the action." *Id.* at 174. Courts "have seen fit to modify, or even dictate, the form and content of a notice sent to putative class members." *Aboin*, 2021 WL 3616098, at *7.

---

[5] The Court finds that three years is the appropriate time period for the collective action. *See infra* Section IV. E.
[6] Recently, in *Barron*, a district court found that the words "who claim they are unpaid overtime wages" should be included in the definition of similarly situated workers approved for the lawsuit. *See* 2022 WL 1571233, at *4.

Here, Plaintiff has submitted a proposed notice form and consent form for the Court's consideration to be sent to members of the collective. (Dkt. #69-1).  Plaintiff requests a sixty-day opt-in period from the date notices are initially mailed (Dkt. #69-8).  Plaintiff also requests that his counsel be permitted to send notice to the potential class by mail and email and that the notice be posted at each of FOGO's locations at which the collective actions members are employed (Dkt. #69-8).  Additionally, Plaintiff requests permission to send the same notice as a reminder notice thirty days after the original mailing (Dkt. #69-8).  Further, to carryout notice, Plaintiff requests the Court to order Defendant to provide Plaintiff with of all putative class members' names, last known addresses, phone numbers, social security numbers, and e-mail addresses within 14 days of the Court's Order (Dkt. #69-8).  Finally, Plaintiff asserts that notice should be given within a three-year statute of limitations because Plaintiff has sufficiently alleged in its Complaint that a willful violation has occurred (Dkt. #69 at p. 21).

In response, FOGO makes five objections to Plaintiff's requests regarding the proposed notice.  First, FOGO generally argues that Plaintiff's proposed notice is improper because "the description of the claims reflects the utter confusion present in the lawsuit itself" (Dkt. #76 at p. 27).  Second, FOGO argues that a posting at its restaurants "is tantamount to giving notice to those who have no claims in this action" and "stirs up litigation" (Dkt. #76 at p. 27).  Third, FOGO argues that notice should not be given for a three-year period because neither the Complaint not any Declarations assert any facts that support a willfulness finding (Dkt. #76 at p. 27).  Fourth, FOGO contends a reminder notice is unnecessary (Dkt. #76 at p. 27).  Lastly, FOGO argues that "given the independence of the restaurants, and that they are separate legal entities, the same notice should not be sent to each" (Dkt. #76 at p. 27).

Thus, the parties dispute five matters relating to Plaintiff's proposed notice: (1) the notice form itself; (2) whether notice should be posted at the FOGO restaurants; (3) whether FOGO must disclose employees' social security numbers; (4) whether a reminder notice should be sent; and (5) whether notice should be given for a three-year period.  Thus, the Court examines these in turn.

**A.  Proposed Notice and Consent Form**

FOGO makes no specific objections to Plaintiff's proposed notice form or consent form beyond opposing the description of the claims contained within the proposed notice form (Dkt. #76 at p. 27).  For example, FOGO argues the description does not specify who was improperly included in the tip pool (Dkt. #76 at p. 27).  Here, because the Court has found that Plaintiff failed to show that and he and the potential collective action members are similarly situated in their performance of pre-shift non-tipped work at the tipped rate, Plaintiff should amend the notice to remove any language that mentions the performance of non-tipped work at the tipped rate.  Further, as to any other issues regarding the proposed notice form and consent form, the Court orders the parties to meet and confer in order to jointly prepare a proposed class notice form.  If there are portions of the notice on which the parties do not agree, the parties should submit their respective positions to the Court for resolution.  The proposed class notice should be filed with the Court within 10 days of the date of this Order.  The sixty-day opt-in period will begin to run from the date notices are initially mailed.

**B.  Method of Notice**

As to Plaintiff's request that the Court authorize a posting at FOGO's restaurants, the Court finds that this is improper.  Though courts authorize posting at work sites in many instances, here, the fact that all employees who currently work at FOGO are subject to the Arbitration Agreement

renders any posting at the restaurants improper.[7] Indeed, the Fifth Circuit has emphasized that although district courts have discretion in issuing notice, they must avoid alerting those who do not have the right to participate in the lawsuit of their potential FLSA claims because doing so "merely stirs up litigation." *JPMorgan*, 916 F.3d at 502 (citing *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 174 (1989)).  Here, as continued employment constitutes acceptance of the Arbitration Agreement, it appears that no current employee can participate in this collective action.  As such, posting notice at the FOGO restaurants would serve no purpose other than to "merely[] stir up litigation." *Id*.

### C.  Information Required by Notice

Third, the Court rejects Plaintiff's request for the disclosure of social security numbers. Plaintiff has not offered any explanation as to the necessity of the social security numbers, and the Court cannot find one.  The request is therefore broad and unnecessary, and FOGO will not be required at this time to produce the information. *See Garcia v. TWC Admin., LLC*, No. SA:14-CV-985, 2015 WL 1737932, at *4 n.2 (W.D. Tex. April 16, 2015) ("With respect to [s]ocial [s]ecurity numbers in particular, privacy and security concerns outweigh the interest in ensuring that notice is received at this stage."); *Flowers v. MGTI*, LLC, No. H-11-1235, 2012 WL 1941755, at *5 (S.D. Tex. May 29, 2012) (noting that plaintiffs' request for social security numbers and dates of birth were "broad and unsupported by the current record"); *White v. Integrated Elec. Techs., Inc.*, No. 12–359, 2013 WL 2903070, at *10 (E.D.La. June 13, 2013) (denying plaintiffs' request for production of the last four digits of [s]ocial [s]ecurity numbers because plaintiffs were adequately equipped to notify all potential class members and privacy concerns outweighed the benefits of disclosure).

---

[7] Presumably, because assent to the Arbitration Agreement became a condition of employment for FOGO employees in 2021, all  employees who currently work for FOGO are subject to the Arbitration Agreement.

Plaintiff also requests the names, the last known addresses, phone numbers, and email addresses of the putative class members who worked for FOGO, which FOGO does not object to (Dkt. #69-8).  The Court finds that FOGO must turn over the putative class members' names, last known mailing addresses, email addresses, and phone numbers in a computer-readable data file to Plaintiff to the extent the information is in its possession within fourteen days of this Court's Order authorizing the revised proposed class definition and notice form. *See Dardar*, 2021 WL 5513417, at *7 (finding that defendant must turnover last known mailing addresses, email addresses, and phone numbers of potential collection action plaintiffs).

### D.  Whether a Reminder Notice Should Be Sent

FOGO objects to Plaintiff's request that a reminder notice be sent, arguing that it unnecessary (Dkt. #76 at p. 27).  However, the Court finds that sending a reminder notice should be allowed.  Indeed, other courts routinely authorize reminder notices. *See Barron v. Sterling Sugars Sales Corp.*, No. 6:21-CV-03741, 2022 WL 1571233, at *5 (W.D. La. May 17, 2022) (authorizing reminder notice); *Young*, 534 F. Supp. 3d. at 726 (same).  Moreover, "the inclusion of a reminder notice furthers the goals" of ensuring that "potential plaintiffs receive accurate and timely information about the pending collective action." *Wingo v. Martin Transport, Inc.*, No. 2:18-CV-00141, 2018 WL 6334312, at *11 (E.D. Tex. Dec. 5, 2018) (internal quotations omitted) (noting district courts are split as to whether reminder notices are appropriate but finding that they are proper).

### E.  Proposed Notice Period

Section 255 generally provides a two-year statute of limitations, but it extends the period to three years for a cause of action arising out of a willful violation of the FLSA. *See* 29 U.S.C. § 255.  Plaintiff argues that he has sufficiently alleged "willfulness" to warrant notice to a class of

potential plaintiffs dating backs three years instead of two years. (Dkt. #69 at pp. 20–21).  Further, Plaintiff asserts that whether FOGO's violations of the FLSA were willful is an issue that goes to the merits of the case and not whether notice should be issued (Dkt. #69 at p. 20).  In response, FOGO points out that Plaintiff's proposed order and notice are inconsistent—the order ties the look-back period to the filing of the lawsuit while the proposed notice ties it to the period prior to the giving of notice (Dkt. #76 at p. 27).  Further, FOGO argues that post-*Swales*, this issue can be considered at the outset (Dkt. #76 at p. 27).  Moreover, FOGO contends that none of the declarations or allegations in the Complaint "assert any facts supporting a willfulness finding" (Dkt. #76 at p. 27).

Plaintiffs have the burden to demonstrate willfulness. *See Ikossi-Anastasiou v. Bd. of Supervisors of La. State. Univ.*, 579 F.3d 546, 552 (5th Cir. 2009).  "To show willfulness, a plaintiff must demonstrate that an employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Steele v. Leasing Enters.*, 826 F.3d 237, 248 (5th Cir. 2016) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-34 (1988)).  "Negligence does not constitute willfulness and unreasonableness does not 'necessarily constitute a willful violation.'" *Ramos*, 2021 WL 3192171, at *7 (quoting *Mireles v. Frio Foods, Inc*., 899 F.2d 1407, 1415 (5th Cir. 1990)).

"Prior to *Swales*, an allegation of willfulness was sufficient at the notice stage to warrant notice covering the prior three years." *Young v. Energy Drilling Co*., 534 F. Supp. 3d 720, 725 (S.D. Tex. 2021).  Post-*Swales*, courts have continued to find an allegation of willfulness sufficient to warrant the FLSA's three-year statute of limitations period. *Id*.; *Torres*, 2021 WL 3419705, at *11 n.10.  Indeed, in *Young*, the district court noted that it "sees no reason to delay notice pending discovery on willfulness in a case such as this where the same evidence of willfulness will apply

31

to all similarly situated potential plaintiffs who receive notice." 534 F. Supp. at 725.  The Court agrees.  Plaintiff has sufficiently alleged willfulness to warrant notice covering the prior three years. As Plaintiff points out, the "facts concerning willfulness can be elicited during full discovery, and [FOGO] may challenge the three-year statute of limitations again at an appropriate time" (Dkt. #78 at p. 5).  Further, the Court finds that the three-year limitations period should be measured from the date this Court issues notice by approving the revised notice form, rather than the date Plaintiff's complaint was filed. *See Ramos v. Capitan Corp.*, No. MO:16-CV-00075, 2016 WL 8674617, at *5 (W.D. Tex. May 18, 2016).

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Motion for Conditional Certification of an FLSA Collective Action (Dkt. #69) is hereby **GRANTED in part, subject to the modifications identified in this Order.**

It is further **ORDERED** that the parties shall meet and confer to prepare a revised proposed collective action definition, proposed notice form, and proposed consent form.

It is further **ORDERED** that the proposed collective action definition, proposed notice form, and proposed consent form should be filed within ten (10) days of this Order.

It is further **ORDERED** that FOGO must provide Plaintiff with the names of all individuals to whom the Court has authorized Plaintiff to provide notice to, their last known mailing addresses, email addresses, and phone numbers in a computer-readable data file within fourteen (14) days of the Court's Order authorizing the revised proposed collective action definition and notice form.

It is further **ORDERED** that Plaintiff is permitted to send notice by first-class mail and e-mail.

It is further **ORDERED** that Plaintiff is authorized to send the same notice as a reminder notice thirty (30) days after the original mailing.

32

It is further **ORDERED** that all individuals who names appear on the list produced by Defendant's counsel have sixty (60) days from the date the notices are initially mailed to file a Consent to Become Opt-In Plaintiff.

> **IT IS SO ORDERED**.
>
> **SIGNED this 13th day of June, 2022.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE